Filed 6/6/25  In re A.W. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.W. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>D.W. et al.,<br><br>        Defendants and Appellants. | A171706<br><br>(San Francisco County Super. Ct. Nos. JD22-3070C, JD22-3070D, JD22-3070E, JD22-3070F, JD22-3070G) |

D.W. (mother) and J.W. (father) appeal from a juvenile court order terminating their parental rights as to five (A.W.2, D.W.2, J.W.2, I.W., and A.W.3) of their 10 children at the conclusion of a permanency hearing.  (Welf. & Inst. Code,[1] § 366.26.)  Mother and father contend the court erred by failing to apply the parental-benefit exception.  We affirm.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

### *The Parties*

Mother and father are in their early thirties and have 10 children. For ease of reference and considerations of privacy, we list the 10 children from the oldest to the youngest as follows: N.W., E.W., A.W., A.W.2, D.W.2 (minor shares the same initials as mother), J.W.2 (minor shares the same initials as father), I.W., A.W.3, R.W., and J.W.3. (born after the initial dependency petition). At times, we refer to the children individually or by the following sibling groups: (1) the three older children (N.W., E.W., and A.W.);[3] (2) the five middle children (A.W.2, D.W.2, J.W.2, I.W., and A.W., undesignated references to "children" are to this sibling group, who are the subject of this appeal), and (3) the two younger children (R.W. and J.W.3).[4]

### *Early Proceedings*

On March 4, 2022, the San Francisco Human Services Agency (Agency) received a referral regarding 16-year-old E.W., who reported father sexually abused her since she was 12 years old. The Agency's investigation revealed father had been making E.W. watch "daddy-daughter porn, making her send

---

[2] Because this appeal raises only the issue of the beneficial parental relationship exception, we focus on the facts related to that disposition as to the five subject children.

[3] N.W. turned 18 years old soon after the initiation of the instant dependency proceedings and was declared a non-minor dependent; her case was later dismissed. At all relevant times, A.W. remained a dependent of the court and was returned to parents' care in August 2022, following a five-month out-of-home placement. E.W. also remained a dependent of the court but in an out-of-home placement with a relative; parents and E.W. expressed the mutual desire not to reunify.

[4] Mother's and father's parental rights were terminated as to the two younger children in January 2024; separate challenges to this determination were lodged and later abandoned on appeal.

him photos of her body parts as well as videos . . . ." Mother and the paternal grandmother "knew what was taking place and did nothing to protect the minor."

On March 8, 2022, the Agency filed a section 300 petition seeking to detain parents' then-existing nine children: 17-year-old N.W., 16-year-old E.W., 15-year-old A.W., 9-year-old A.W.2, 8-year-old D.W.2, 7-year-old J.W.2, 6-year-old I.W., 4-year-old A.W.3, and 15-month-old R.W. The petition alleged the nine children were at risk of harm because father had been molesting E.W. since she was 12 years old and because of mother's and father's history of drug and alcohol abuse, father's mental health issues, and father's aggressive behaviors. All nine children were detained and placed in three different foster homes (E.W. was in one home; N.W., A.W., and R.W. were in a second home; and the five middle children were in a third home).

Following detention, the Agency filed an ex parte application seeking to suspend father's and reduce mother's visits because father had punched J.W.2, hit him with a belt, and touched his penis; and father showed the five middle children pornography. The children were guarded and appeared to have been coached about what to say to the Agency's case workers; parents had also threatened that the children would be "adopted" if they talked about what happened at home.

The juvenile court granted the Agency's request and suspended father's visitation pending trial and reduced mother's visits to one two-hour in-person visit and one one-hour virtual visit per week. But the ongoing supervised visitation with mother continued to cause the five middle children emotional turmoil, who presented as dysregulated after visits. Despite the suspension of father's visits, mother called father during visits and had the children watch videos from him. During one virtual visit with mother, A.W.3 was

3

screaming and crying and had to be consoled by the resource parent. At an April 2022 visit, D.W.2 refused to see mother. In another virtual visit, A.W.3 began crying because her foster mother left the room; "mother, while on camera and in front of the children, claimed that the children were being coached and ended the visit early."

During this reporting period, J.W.2 disclosed that father taught him how to watch pornography. In a subsequent forensic interview, J.W.2 confirmed that he watched pornography with his father, who taught him how to access it; father also had touched his genitals, rubbed his butt, licked his butt, kissed him, and used a glove and stuck a finger in J.W.2's rectum. J.W.2 disclosed that father touched J.W.2's face after father touched his own butt, and J.W.2 thought there was "poop" on his face. J.W.2 said his mother came into the room and washed his face. Since placement, J.W.2 had accessed pornography several times on the foster parent's phone and computer. Because of the level of detail in J.W.2's disclosures at age seven, the Agency believed he was telling the truth.

I.W. disclosed that father pulled her underwear down, put his hands down her pants, repeatedly rubbed her vagina, and told her that if she told anyone, "momo" would get her. I.W. had nightmares, said that a monster was following her, that the monster was covering her mouth so she would not talk, and that the monster was threatening to kill her. I.W. said the monster was her father.

I.W. was acting out, kicking walls and having screaming fits. The six year old was also hearing voices, indicating severe trauma. She had trouble sleeping, had nightmares, and would yell at night, "let me go, don't touch me." The caretaker was nurturing to I.W., who at times did not want to sleep alone, and the two would sleep on separate couches next to one another.

4

D.W.2 had disclosed, and E.W. confirmed, that father had slapped her and pulled her hair. D.W.2 had an episode in May 2022 where she screamed and yelled that she was seeing "spirits." D.W.2 had acted out at the foster home, having tantrums, kicking walls, and spitting on the caretaker.

Once during a bath, A.W.3 asked D.W.2 to touch her private parts. D.W.2 did not touch A.W.3, who said she did not know why she had asked to be touched; D.W.2 said it was because they watched "porn" together. Four-year-old A.W.3 disclosed in detail that she, D.W.2, and I.W. watched "naked girls kissing." A.W.2 also confirmed to the resource parent that D.W.2 and I.W. would watch pornography. A.W.2 reported she knew they were not returning home and was "not mad about it."

Father did not take any responsibility for his actions other than to say he had been drunk and high and, thus, did not remember committing the abuse. In conversations with mother and father about the abuse, father was controlling and dominating. Mother acknowledged only what happened to E.W. but never took any protective measures and stated it happened "years earlier." Mother demonstrated no remorse or empathy for E.W.'s emotional struggles following the abuse.

The children exhibited effects of multiple forms of abuse: nightmares, tantrums, hitting, and inappropriate sexual exploration and contact with one another. The Agency had consulted with a childhood trauma and attachment expert who confirmed that anxiety, depression, cognitive delays, and the somatic behaviors of the children were related to the sexual abuse they experienced. Individual therapy was recommended for the children to address their trauma and emotional symptoms, but mother would not consent to such services for any of the children.

In terms of academics, the school-aged children appeared to be behind. The children did not have consistent attendance at school while in their parents' care. A.W.2 was below grade level in reading and math. D.W.2 had an "Individualized Education Plan" (IEP) for "behavioral issues," a speech delay, and a learning disability. I.W. also had an IEP for a speech delay/language impairment. J.W.2 was not reading at grade level.

Mother made obtaining services for the children very difficult, including services provided from the school and for medical appointments. She failed to sign the necessary documents for the children to ride the school bus; she did not want anyone present at the IEP meetings of her children; and she cancelled an appointment for D.W.2 at Children's Hospital to address the minor's possible heart condition. In addition, mother was aggressive, threatening, and uncooperative with the Agency.

In June 2022, the juvenile court found it had jurisdiction over the children and ordered reunification services for parents, including weekly supervised visitation for mother and weekly virtual visitation for father.

On August 8, 2022, A.W.2 was hospitalized "due to hearing voices that started after in-person visits with her parents the week prior." The voices told A.W.2 "to harm herself or others including her siblings." A.W.2 told a treating psychologist that father told her she would be returning home in December and that "scared her." The treating psychologist reported that A.W.2 " 'was really clear about being afraid of going back home . . . .' " A.W.2 was discharged that evening, but was brought back to the hospital the very next day after her foster parent stopped her from jumping out of a window. She received inpatient psychiatric care for approximately a week before being discharged. All visitation between parents and A.W.2 ceased after the suicide attempt. A.W.2 later told her treating psychiatrist that she refused

6

visitation with her parents because father "had sexually abused her in the past and . . . ha[d] touched her on her private areas two times under clothes"; she also did not want to visit with mother because "mother was aware of the abuse."

On August 18, 2022, the Agency filed an ex parte application seeking a finding that visits with the parents were detrimental to the children and an order suspending those visits. The Agency reported that mental health professionals had expressed concerns about parents' interactions with the children and their alleged failure to acknowledge the abuse. The juvenile court temporarily suspended visitation pending further hearing but, on August 31, 2022, denied the Agency's ex parte application without prejudice.

In a November 8, 2022 addendum report, the Agency recommended the out-of-home placement for the children should be preserved at all costs given the stability it was providing these vulnerable children; parents should have separate visits with the children's siblings placed in different homes; and the same personnel should supervise and transport the children. The Agency recommended that visitation should be reduced if parents could not conform their behavior.

The Agency based its recommendations, in part, on the following: parents missed 15 of 23 scheduled visits between July and November; the visits when they occurred were chaotic—the children never knew what to expect; parents disobeyed directives of the court (e.g., to not record the children) and refused to abide by the redirection efforts of Agency staff supervising the visits; the children showed worrisome psychiatric symptoms, including self-harming behaviors and repeating with each other sexual acts perpetrated against them by father; and parents showed no concern over

7

these troubling behaviors and lacked empathy for their children's suffering. The court denied the Agency's request to reduce visitation.

In its January 27, 2023 report for the six-month review hearing, the Agency stated that the five middle children remained placed in the same resource home where they had been since March 2022. The resource parent was a skilled, dedicated, loving, and nurturing caregiver who provided ongoing support to each individual child, despite the children's behaviors of cursing, hitting, destroying the home, attempting to access pornography, and reenacting sexual acts on each other. Each of the children reported they enjoyed living with their caregiver, whom they affectionately referred to as their "Granny." The caregiver maintained a commitment to the children in spite of the parents' threats and allegations against her. The Agency reported: "For months, the parents have made ongoing contact and threats to the resource parent via mail, phone and text messages, and false allegations against the resource parent, and [her] relatives, which led to multiagency and cross county investigations that have also involved law enforcement."

Communication with mother and father had been difficult. The Agency reported parents were "hostile, angry, and disrespectful" and exhibited behaviors "includ[ing] but not limited to yelling, screaming, spitting while yelling/screaming, posturing over the table, making false allegations against the Agency, attorneys, resource parents, and courts, in addition to making threats against service providers, resource parents," and Agency staff. Parents had not changed their behaviors and had not taken responsibility for their conduct; instead, they deflected and accused others of abusing the children.

Visits between parents and the children had been inconsistent; parents had attended only 40 percent of visits with sporadic frequency and limited

8

quality. Between July 2022 and January 2023, mother and father only completed 18 of the 43 visits offered.

The Agency concluded, in consultation with the involved team of experts, that the children's destructive behavior after visits was due to confusion: they missed their parents but recognized the reality of what they suffered differed from what their parents coached them to say. Being coached to lie could result in serious, long-term consequences to the children, including various personality disorders. Each of the children had unique behavioral health and developmental needs that required caretaking with sensitivity, support, and nurturing so they might heal and reach their full potential.

Despite the many extreme and challenging behaviors that the children presented and the acknowledged trauma, mother and father did not think the children had any mental health issues; rather, they believed the children should return home. In June 2022, the Agency recommended that the children engage in individual therapy. However, due to parents' refusal to consent to therapy, the children did not begin therapy until August 2022, at which time the court ordered consent for the children's mental health treatment be delegated to the Agency. Parents also had not supported the children in any academic work or provided for any of their educational or developmental needs; parents refused to collaborate with service providers.

On February 14, 2023, following a two-day contested hearing, the court continued the out-of-home placement order for the children, found parents "failed to consistently engage in in-person visitation," found reasonable efforts had been provided to them, and continued the case to the 12-month review. As to visits, the court ordered that a clinician be on site for in-person visits, and the Agency had to provide a virtual make-up within 48 hours of

9

any missed in-person visit.  The court later gave the Agency discretion to increase the frequency of visits and to move visits to unsupervised and overnights upon 72-hours' notice to counsel.

On March 14, 2023, the Agency filed a third ex parte application to suspend visitation.  The Agency explained that parents attended only nine of the 24 scheduled visits between November 2022 and January 2023.  The children suffered emotional distress from contact with their parents, as evidenced by their postvisit behaviors, which included urinating on themselves, destroying the resource family home, and hitting and using obscene and profane language with each other and the resource parent.

Between January and March 2023, parents attended only five of the nine scheduled visits (three in person and two virtual).  The inconsistency was dysregulating to the children.

Additionally, mother and father were threatening to all people involved in the case.  Specifically, mother threatened to report J.W.2's and I.W.'s prior therapist to the police for lying and made threatening calls and texts to the resource parent.

Following an unauthorized school visit by parents, the Agency held a meeting with professionals from eight entities serving the children and concluded that visits needed to be suspended, in part because a consulting psychologist specializing in childhood trauma clinically determined that visitation between the children and parents was detrimental.  The Agency ended its application by stating, "[t]he only conclusion to be drawn from this is that the abuse perpetrated by the parents on these children was pervasive, deep, and foul.  The children have suffered trauma, the magnitude of which is likely unknowable."

On March 15, 2023, the juvenile court denied the request to suspend visits. The court, however, issued a temporary restraining order protecting the Agency's attorney, minors' counsel, the caretaker, and the children. The temporary restraining order was later dissolved in May 2023 for unknown reasons.

On April 6, 2023, the Agency submitted a 12-month status review report recommending that parents' reunification services be terminated. Father continued to deny any wrongdoing, claiming he was singled out and falsely accused of sexually abusing his children. Mother believed father; she repeatedly took his side and demonstrated a lack of capacity to protect the children.

During this reporting period, parents continued to thwart needed therapeutic care for the children. At a behavioral health child and family team meeting, mother said the Agency forced the children to lie; she also did not approve of the children's participation in mental health treatment.

Parents had once-a-week visits with the children on Wednesday afternoons for two hours at a visitation site. During the January to March 2023 reporting period, parents made it to only four of the 14 in-person visits offered with the children. Parents canceled for various reasons and sometimes outright declined to visit. Of the 20 virtual visits offered, parents completed just three. The Agency explained, "[i]n sum, the parents participated in 30 percent of virtual visits, and declined other virtual visits with the children."

The report concluded that the safety threats still existed. Father continued to deny the sexual abuse and showed no responsibility or remorse for his actions. Parents refused to communicate and collaborate with the Agency and instead continued to state they were falsely accused.

In a June 12, 2023 addendum report, the Agency advised the juvenile court that parents' participation in visitation continued to decrease. From disposition in June of 2022 to the 12-month review the following year, parents had been offered 75 in-person visits, but attended only 27, with some children refusing to participate in many of those.

At the contested 12-month review hearing on June 12, 2023, parents' reunification services were terminated, and adoption was selected as the recommended permanent plan. Visitation with mother and father was reduced to two virtual visits and one in-person visit per month.

### Section 366.26 Reports

In a September 21, 2023 section 366.26 report, the Agency recommended termination of parental rights as to the two youngest children (R.W. and J.W.3). The Agency also requested a 180-day continuance regarding the permanency planning for the five middle children.

The five middle children had remained in the same placement for the last year and a half. The home was safe, nurturing, and supportive. The caretaker referred to the five children as her "grandbabies," and they referred to her as their "Granny."

Since the 12-month review, parents' visits remained inconsistent and chaotic. They attended three of six in-person visits, and participated in five of seven virtual visits. Mother continued to disregard visitation rules and recorded the children, made accusations against their caretaker, and posted negative and identifying information on social media about the caretaker.

On October 25, 2023, the 180-day continuance was granted for the five middle siblings at issue here. At the section 366.26 hearing on January 19, 2024, parental rights as to J.W.3 and R.W. were terminated.

On March 19, 2024, the Agency filed its fourth ex parte application to suspend visitation between parents and the middle children. Since the reduction in visits at the 12-month review of nine possible in-person visits between June 2023 and February 2024, parents attended only three. This resulted in a six-month lapse between their last visit in August 2023 and their most recent visit in February 2024. Of the 18 possible virtual visits offered during this time, the parents attended 10 (one visit was cancelled by the Agency).

During the February 2024 visit, someone slipped I.W. a note with mother's and A.W.'s phone numbers, despite the court order for supervised contact only. A picture of the note was attached to the motion. Parents also recorded the children and asked about their placements; when they were redirected, father started yelling and cursing at Agency staff and A.W. threatened to physically harm Agency staff. A.W.3 started crying and returned from the visit emotional and "tender." I.W. confirmed that she had been recorded and asked about her caretaker's name and whether the caretaker had touched her or hit her. Father told I.W. to lie and say "she hit you." I.W. expressed concern about the "drama" her parents created in their lives.

Parents continued to call and mail letters to the children's caregiver with threats to sue and to ruin the caregiver's business. These threats resulted in a separation of the sibling group in October 2023. A.W.2, D.W.2, and I.W. remained with Granny, while J.W.2 and A.W.3, were eventually placed together in a fost-adopt home in January 2024. The Agency reported that continued visitation with parents disrupted the children's overall stability, which could negatively affect permanency.

After a contested hearing on March 22, 2024, the court suspended in-person visits; thereafter, only virtual visits were available.

On April 15, 2024, the Agency filed a second 366.26 report regarding the five middle children, this time recommending parental rights be terminated. The report explained that A.W.2, D.W.2, and I.W. felt safe in their home with Granny and had a loving and strong relationship with her. Granny actively engaged the children's care team and the resource parents caring for J.W.2 and A.W.3. The report explained A.W.2, D.W.2, and I.W. deserved the stability adoption offered with Granny, who thought of the three girls as her "grandbabies." She was committed to permanency and the healthy development of the three girls.

The placement for J.W.2 and A.W.3 was meeting their needs; they had adjusted to their fost-adopt home, which they had been in for four months. At every visit by the social worker, J.W.2 and A.W.3 appeared happy and comfortable and sought out the caretaker for their overall basic needs. The resource parent was a loving and dedicated caretaker, who demonstrated an ability to meet J.W.2's and A.W.3's basic and complex needs and advocated for them. She was committed to providing them permanency. The Agency explained that adoption would provide J.W.2 and A.W.3 with stability and a lasting sense of security and permanency.

With respect to visitation, the Agency noted, "the interactions with the parents are disruptive, harmful, and cause confusion and instability in the children's lives. It is the hope that over time, the children will deepen their relationship with their current resource parent who in a short period, has demonstrated a commitment to them and that the children achieve permanency by way of adoption."

During this reporting period, A.W.2 continued to refuse visitation with parents. I.W. felt like she had been in a "loyalty conflict situation" after parents slipped her a note at the last in-person visit, making her feel like she had to choose. I.W. also expressed worries about parents' attempts to create " 'drama' " in her life and in the lives of her siblings.

After the last in-person visit in February 2024, J.W.2 and A.W.3 demonstrated an observable regression in their development. J.W.2 returned from the visit upset and crying and began hiding things from the resource parent and lying, arguing, and refusing to complete tasks. A.W.3 stopped sleeping through the night, wet the bed, and refused to leave her bed for school.

As to visitation, the report summarized that throughout the case, parents had only participated in about 30 percent of the offered visitation. Parents attended four of the five virtual visits between April and August 2024 and continued to confuse the children, express negative thoughts about the Agency, and make false promises to the children; problems occurred in each visit.

### Contested Section 366.26 Hearing and Decision

After several continuances, the section 366.26 hearing for the five middle children occurred on September 19, 2024. Mother and father were present; neither parent testified.

Stipulations for D.W.2, I.W., and J.W.2 were submitted to the court about their wishes for adoption, obviating the need for their testimony.[5] A.W.2 had previously stated that she wanted to be adopted by Granny.

The child welfare worker co-authored two reports for the hearing and testified that she had worked with the family since July 2022. None of the

---

[5] These stipulations do not appear in the record.

five middle children had mental or emotional issues that would prevent them from being adopted, and both caregivers had indicated their wish to adopt the children.

For the duration of the case, parents missed about 70 percent of visits. Consistent problems with the visits prompted the Agency to again ask for the termination of in-person visits; the request was granted in March of 2024. Even so, parents' remaining contact with the children was disruptive and inconsistent; parents missed about 20 percent of the virtual visitation. The visits were chaotic and unfocused; parents were often distracted by whomever was supervising the visits or in their belief that someone was making the children do something against their will. The child welfare worker did acknowledge that at times the visits were "loving where they are checking in," and the children hugged their parents at a few visits. But, even when the children expressed "liking" the visits, they often disrupted the children's day-to-day life and their stability. Ultimately, the child welfare worker opined that the termination of parental rights and contact would not be detrimental to the children. This opinion was based on the fact that parents continued to question the children's reality, deny their abuse and neglect, and disregard parameters placed around visitation to ensure the children's psychological well-being. In addition, A.W.2 had not seen her parents in over two years.

The child welfare worker testified that Granny was committed to adopting the three girls in her care (A.W.2, D.W.2, I.W.); she was well aware of their psychiatric issues and special needs, had been provided related psychoeducation, and understood what it would take to care for the girls. Throughout the case, Granny had been committed to providing permanency for the children.

An Agency protective services worker who had been assigned to the case in January 2024 also testified. Similar to the child welfare worker, the protective services worker opined that none of the five middle children had mental or emotional issues that would prevent them from being adopted and confirmed that their current caregivers were committed to adoption.

The protective services worker did distinguish I.W., who would likely want to know "when or how she would be able to see her parents" if parental rights were terminated. But the worker did not think that termination of parental contact would "interrupt [I.W.'s] overall daily functioning and mental health." However, the worker had never asked I.W. "how she would feel if she never saw her parents again." In her professional opinion, the worker still believed that termination was in the children's best interest, even in spite of I.W.'s repeated statements that she wanted to see her parents and would cry if she could not see her parents again. I.W. never spontaneously asked about contact with her parents, and the worker received no information about the child being excited for upcoming parental visits. By contrast, I.W. expressed joy and excitement about her current placement, school, and hobbies.

D.W.2. was conflicted about being adopted. However, the worker believed termination of parental rights would not be detrimental to her as long as she had "adequate mental health and natural support" in place. In fact, D.W.2 had specifically asked not to participate in the last parental visit; her parents were telling her sibling to get her, "and it was making her very uncomfortable."

When asked about J.W.2, the worker testified that termination would not be detrimental to his overall physical or mental health. J.W.2 presented as conflicted: at times, he would really want to participate in visits, and at

17

other times, he did not feel like it. More often he really missed seeing his sisters' caregiver. Although J.W.2 had said he would feel sad if he never saw his parents again, he also stated he "wanted to stay where he was at. He is comfortable where he is at. He feels safe and supported where he is at."

When asked how A.W.3 would handle never seeing her parents again, the worker testified she did not think it would be detrimental to A.W.3's physical or mental health if she never saw her parents or communicated with them again. A.W.3 oftentimes expressed confusion and was conflicted about attending visitation. A.W.3's caretaker helped her grow in a positive direction by supporting and nurturing her.

In her professional opinion, the protective services worker opined that termination would not be detrimental to the overall well-being and mental health of any of the five middle children. Summarizing her recommendation, she explained, "naturally they are going to have some questions" about termination of parental rights, but "I think it is our job and the adults involved to help support them with those questions and answers, and I think that with the adequate support that they will adjust fine." When asked about whether the children would suffer harm upon termination, the worker answered, "I think that [it] is a grand word to use, 'harm.' I don't think there will be any harm. I think they might have questions, but I don't think [asking] for answers is going to be detrimental."

The worker had personally observed several virtual visits; they were chaotic and tended to become dysfunctional. There were times where the children reached out to her, stating they did not want to visit, but parents would disregard the children's wishes, thinking the Agency was withholding the children. In most visits there was an "ebb and flow of it going well and then it turning in a different direction where it is not as productive of a visit."

When a visit did not occur, the children did not experience any regression after not seeing the parents.

At the conclusion of the hearing, the juvenile court found that the children were adoptable, parents had not maintained consistent contact with the children, the effect of visitation on the children was negative, the children would not benefit from continuing the relationship, and severing the relationship would not be detrimental to the children. In rendering this decision, the juvenile court explained: "These are children who are very young. I have got an 11 year old, a ten year old, a nine year old, an eight year old, and a six year old. It only makes sense that they would not quite understand the concepts that we all deal with day in and day out and that they would be conflicted and that in their hearts they love their parents because that is what we all do as humans no matter how good or bad or negligent they may be. [¶] . . . Even if I was to assume that the minors did understand the concept of adoption and visitation and post-permanency and assume they want to be with their parents, period, in whatever fashion that means, I have to apply very specific rules and very specific law not only statutorily but case law to make my determination today." The juvenile court further observed that "there is a level of emotional dysregulation that the kids suffer post-visit. That is problematic. That should not be the case. To me that is a compelling fact that when I look at whether or not [the termination of] parental rights would be detrimental, the answer to me is no."

The court considered the opinions expressed by the testifying workers that adoption was the appropriate permanent plan. The court then terminated parental rights.

19

## DISCUSSION

Mother and father argue the juvenile court erred in concluding they did not establish the parental-benefit exception.[6]  We disagree.

At a permanency hearing, the juvenile court must select and implement a permanent plan for the dependent child.  (§ 366.26, subd. (b); *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  Adoption is the preferred choice.  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  First, the court determines if there is clear and convincing evidence the child is likely to be adopted.  (*Caden C.*, at p. 630.)  If so, and if there has been a previous determination that reunification services should be terminated, the court must terminate parental rights and place the child for adoption.  (*Ibid.*)  But if a parent demonstrates that termination would be detrimental to the child for at least one statutory exception, the court should reject termination and select another permanent plan.  (*Id.* at pp. 630–631.)  The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' "  (*Id.* at p. 631.)

Among the exceptions is the parental-benefit exception.  (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 631.)  The beneficial parental relationship exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  "No matter how loving and frequent the contact, and

---

[6] Mother and father do not present any arguments regarding termination of their parental rights or application of the beneficial relationship exception as to A.W.2, accordingly, they have forfeited any related claim.  (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [absence of legal argument allows court to treat contentions forfeited]; *Cox v. Griffin* (2019) 34 Cal.App.5th 440, 447  ["An appellate court is not required to make arguments for parties"].)

notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.]  The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences.  Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.]  Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

To prevail, the parent must demonstrate three elements by a preponderance of the evidence:  regular visitation and contact with the child; a relationship that, if continued, would benefit the child; and that terminating parental rights would be detrimental to the child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 629.)  Regarding the third element, the question is "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)  We review the juvenile court's conclusions on the first two elements for substantial evidence.  (*Id.* at p. 639.)  We review its conclusions as to the third element for abuse of discretion, but any factual determination underlying its conclusion for substantial evidence.  (*Id.* at p. 640.)

Here, we have no difficulty concluding that substantial evidence supports the juvenile court's finding that mother and father failed to carry their burden of demonstrating a beneficial parental relationship.

*Visitation*

To start, substantial evidence supports the juvenile court's finding that mother and father had not "maintained regular visitation and contact with the children." Indeed, mother and father attended less than 30 percent of the visitation offered, yet do not present any serious challenge to this finding. Mother agrees she missed the "majority" of the overall visitation provided but instead focuses on the five months leading up to the September 2024 section 366.26 hearing, during which she attended 80 percent of the monthly virtual visitation. For his part, father picks out isolated visits and describes the quality of those limited interactions.

Regular visitation exists where the parents visit consistently and to the extent permitted by court orders. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537.) That level of visitation did not occur here, and its lack fatally undermines any attempt to find the beneficial parental relationship exception. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 554 (*C.F.*) [visitation consistent near the section 366.26 hearing, but sporadic overall, is insufficient to meet the first prong of the beneficial parent-child relationship exception]; see also *In re J.C.* (2014) 226 Cal.App.4th 503, 531 [regular visitation prong not present when there were significant lapses in visitation]; *In re I.R.* (2014) 226 Cal.App.4th 201, 212 [significant lapses in visitation fatally undermines any attempt to finding beneficial parental relationship exception].)

*Parental Role/Attachment*

Even if there had been sufficient visitation, the record does not show mother and father had a beneficial relationship with any of the five middle children. To satisfy the second prong of the beneficial parent-child relationship exception, the "parent must show he or she occupies a parental

22

role in the child's life, resulting in a significant, positive, emotional attachment between child and parent." (*C.F.*, *supra*, 193 Cal.App.4th at p. 555.) " 'The factors to be considered when looking for whether a relationship is important and beneficial are:  (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.' " (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315.)

By the time of the section 366.36 hearing, 11-year-old A.W.2, 10-year-old D.W.2, 9-year-old J.W.2, 8-year-old I.W., and 6-year-old A.W.3 had spent two years of their young lives as dependents of the court.  Visits with mother and father, while not wholly unpleasant, never revealed a significant, positive, emotional attachment.  To the contrary, the visits were described as chaotic and dysfunctional.  Prompted by parents' behavior and its deleterious effect on the children, the Agency sought to terminate visitation no less than four times.

The children invariably became emotionally dysregulated after each visit.  The children's postvisit behavior included urinating on themselves, destroying the resource family home, and hitting and using obscene and profane language with each other and the resource parent.  Less overt behavior included lying, sleep disturbances, and refusing to go to school.  By far, the most troubling example of the negative impact of parental visitation occurred when A.W.2 tried to commit suicide after a visit where she was misinformed that she would be returning to parents' care.  Thereafter, A.W.2 consistently refused to participate in visitation with parents and was very clear about not wanting to go back home.  Importantly, the children did not act out or otherwise show distress when parental visitation did not occur.

Conversely, the children were thriving and bonding with the approved foster families who hoped to become their respective adoptive families. Children are entitled to bond with individuals who will assume the role of parents in their lives. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854; see *C.F.*, *supra,* 193 Cal.App.4th at p. 557 ["children are entitled to stability and permanence through adoption"].) The resource parents were committed to making sure the children received the appropriate services; the children had psychological, emotional, and educational needs that required additional support. Not only did mother not assist in obtaining the necessary services, she actively hindered the efforts of the Agency and the children's caretakers to do so.

Moreover, parents consistently failed to take responsibility for the abuse they perpetrated; rather, they blamed their substance abuse and "problem child" E.W. as the source of the family's difficulties. Parents refused to acknowledge the very real trauma that the children had endured or the children's need for professional help. Parents also refused to respect the boundaries placed around their visitation with the children, including enabling unauthorized contact with father during times when his visitation had been suspended.

### *Detriment*

Finally, the juvenile court did not abuse its discretion by concluding the children would not suffer detriment that would outweigh the benefit of adoption. (*Caden C.*, *supra,* 11 Cal.5th at p. 633.) Even assuming the children loved their parents and were conflicted about being adopted, on balance, considering the clear benefits offered by the children's respective adoptive parents and lack of contradicting evidence, the court was well within its discretion to conclude mother and father did not establish the

24

" 'exceptional circumstances' " of the exception.  (*Caden C., supra*, 11 Cal.5th at p. 631.)

## DISPOSITION

The order terminating mother's and father's parental rights as to A.W.2, D.W.2, J.W.2, I.W., and A.W.3. is affirmed.

DESAUTELS, J.

We concur:


RICHMAN, ACTING P.J.


MILLER, J.


*In re A.W. et al.* (A171706)